UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                          :

EDDIE LUIS SOTO,                   :
                          :

            Plaintiff,      :    **<u>MEMORANDUM</u>**
                          :    **<u>DECISION AND ORDER</u>**
     -against-         :
                          :    05 Civ. 4764 (BMC)(MDG)
ECC INDUSTRIES, INC., and LOCAL 32B-  :
32J, SERVICE EMPLOYEES       :
INTERNATIONAL UNION, AFL-CIO,   :
                          :

          Defendants.    :

-------------------------------------------------------- X

**COGAN**, District Judge.

      This is a hybrid action under §301 of the Labor Management Relations Act in
which plaintiff claims that his employer improperly terminated him and his union
breached its duty of fair representation by not grieving the matter. The case is before the
Court on the motions for summary judgment of the union and the employer. The facts
are undisputed that plaintiff failed to cooperate in the union's attempt to consider whether
to pursue his grievance, and there were ample additional grounds for the union to decide
not to do so. Given the undisputed facts, no reasonable jury could find that the union
acted outside of the broad discretion that the law allows in concluding that pursuit of a
grievance would not be successful. The motions for summary judgment are therefore
granted.

## BACKGROUND

In or about 1990, plaintiff began working for defendant ECC Industries, Inc. as a porter. ECC terminated him on April 7, 2005, for reasons arising out of an incident that occurred on March 8, 2005. According to ECC, plaintiff refused a direction from his supervisor to shovel snow, which ECC contends was part of his job, and that later the same evening, he approached his supervisor, held out his hand in the position of a gun, and made the sound, "Pum." ECC therefore terminated him for insubordination and for "threatening your supervisor by raising your hand in a gun position and firing."

Plaintiff, not unexpectedly, sees it differently. He does not expressly deny ECC's allegation that he refused to shovel snow, but suggests that he would have been willing to comply if ECC had met his conditions. He notes that under the applicable collective bargaining agreement, with which he claims he was familiar at the time of the incident, ECC had an obligation to provide "adequate clothing and equipment" when an employee is asked to remove snow, and so he asked for a coat. (Plaintiff does not say why he could not wear his own coat, which presumably he had if there was snow on the ground.) He also asked for extra pay based on his belief that other workers were paid extra to shovel snow (the record shows no basis for this belief). He claims his supervisor did not respond to his requests but just continued to order him to report. As to the alleged gun gesture, which followed the snow discussion, plaintiff claims that he was gesturing for a spray cleaner bottle so he could clean a wall. (One might think that ECC has the more credible version of this exchange, but this is a motion for summary judgment, and I therefore reach no conclusion as to credibility.)

This factual dispute would be manageable, and perhaps plaintiff's union, defendant Local 32BJ, might have pursued a grievance on plaintiff's behalf if that was all there was to it. But there was more to the story. A history of trouble existed between plaintiff and ECC, and even some between plaintiff and Local 32BJ. Local 32BJ had to take additional facts into account when deciding whether to pursue a grievance.

First and foremost, plaintiff was already subject to a "final warning letter" at the time of the gun/spray bottle incident. The "final warning" arose from an earlier incident in October of 2003. Both sides agree that on October 24, 2003, plaintiff was taking photographs of the ECC logbook. It appears that plaintiff believed that certain workers were receiving preferential treatment, and thought that photographs of the logbook might substantiate that belief. Plaintiff's supervisor, Alonso Rebolledo, observed him and they became engaged in a heated argument when Rebolledo told him to stop. Plaintiff was ordered to leave the building, which he did.

ECC required plaintiff to appear at a meeting with its President, Richard Dauber, to discuss the incident three days after it occurred. It was this meeting that led to the issuance of the final warning letter on November 7, 2003. The final warning letter sets forth admissions that plaintiff allegedly made at that meeting about the incident, including that: (1) he had acted in an agitated and threatening manner; (2) he told Rebolledo that he would "destroy" Vice President Evita Tabares "if it was the last thing your [sic] going to do in your life"; (3) he had made racial remarks about Columbians (apparently, either Tabares or Rebolledo or both are of Columbian origin) and said that Rebolledo was "racial against blacks;" and (4) he had told Rebolledo that he was hiring a private investigator "to search Ms. Tabares [sic] background to see how qualified she was

3

for this position." Plaintiff's affidavit in opposition to the motions disputes making the "destroy" remark and the admission that he acted in a threatening manner, but he does not deny the racial remarks or the "private investigator" threat.

The final warning letter concluded by stating that:

**BE ADVISED: THIS IS YOUR FINAL WARNING. YOU WILL BE IMMEDIATELY TERMINATED FOR THREATENING, CURSING OR MAKING RACIAL REMARKS WHILE ON THE JOB OR FOR REFUSING TO FOLLOW SUPERVISORY DIRECTIONS.**

(emphasis in original).

Plaintiff did not file a written grievance as to this final warning letter. When asked at his deposition, "Can you tell me why you didn't file … a grievance with the union after receiving this," plaintiff stated that he didn't file because, in essence, he didn't trust the union:

A: Because of my prior experience already with the union. No one was coming there for me. … I don't get help from no one, you know....

Q: So it is your position that [ ] you didn't file a grievance with the union at this time because your prior experience was that the union didn't help you?

A: That and more.

* * *

Q: You received this [final warning letter] in or about October or November of 2003, this personal reprimand notice, correct?

A: Yes.

Q: But you didn't file a grievance with the union with respect to receiving it? You didn't ask to challenge?

A: No one ever – I hardly had any prior experience with the union to say, hey, grieve this. In November of 2003, I go into the office of Anthony Spataro [a Local 32BJ business agent supervisor] and Tommy Lawson [a Local 32BJ business agent]. I am told by Tommy Lawson shut up or I'll ask you to leave. So they are not there for me, you know. He is writing anything he wants on a paper. No one is guiding me as to what I do. I

already was skeptical ... I can't ask for these **people's** help....[1]

The mistrust that plaintiff had for Local 32BJ **had** not always been present. Plaintiff and Local 32BJ proceeded together to file a grievance when plaintiff was transferred away from his preferred work location in 2001. The grievance was at least partially resolved in plaintiff's favor by his reassignment to his preferred location. Plaintiff credits his union representative with accomplishing the reassignment (although he now asserts that he was given different responsibilities at that location that were less to his liking).

In addition, in March 2004, after issuance of the **final** warning letter, plaintiff filed another grievance which his union picked up, complaining about various work-related conditions, such as an excessive workload. He appears to have been satisfied with his union's intercession, including Lawson's (in whom he now contends he had lost trust four months earlier, leading to his decision not to grieve the final warning letter), as he wrote Lawson a very nice email expressing his gratitude.

The other incident that the parties have identified, although I am not sure why any of them regard it as material, arose from plaintiff's application for an open position as an elevator operator in November 2004. ECC rejected his application for this position on the ground of his prior insubordination and threats, as described in the final warning

---

[1] In his affidavit in opposition to the pending motions, plaintiff offers a different version of what happened in this meeting with Lawson and why he did not file a grievance: "I was told by Lawson in November 2003 that Lawson was going to take care of removing the final warning. I asked Lawson if I needed to file a grievance, and he said the matter was resolved. He told me not to grieve the 2003 Final Warning and there was no need to seek help from the union's complaint officer ...."

The affidavit squarely contradicts the deposition testimony. Defendants' counsel pressed hard at plaintiff's deposition for the reason why plaintiff never grieved the final warning letter, and only in opposition to the instant summary judgment motions did plaintiff offer this alleged assurance that Lawson gave him. It is well established that a court may disregard a portion of a summary judgment affidavit that contradicts a party's deposition, see Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001), and that is what I will do here.

5

letter. Plaintiff neither grieved this decision nor asserted any protest to the final warning letter.

It was against this backdrop that Local 32BJ had to evaluate whether to pursue a grievance for plaintiff's termination. As if it were not already hard enough, plaintiff made it harder. He did not contact the union promptly after his termination or otherwise indicate that he wanted a grievance filed concerning it. His stated reasons at deposition for not contacting the union were his mistrust for Local 32BJ and his somewhat inconsistent belief, unsupported by any facts, that Local 32BJ would file the grievance without being asked (unlike his prior successful grievances which he himself had asked Local 32BJ to initiate).

Under the applicable collective bargaining agreement, a grievance attacking an action by an employer had to be filed within 45 days of the action. Plaintiff apparently changed his mind about expecting Local 32BJ to do it *sua sponte*, and finally filed a complaint with Local 32BJ on May 11, 2005. Since plaintiff's letter of termination was dated April 1, 2005, a conservative calculation left only five or six days for Local 32BJ to set up a first step grievance meeting.

Lawson, the business agent, upon receiving plaintiff's grievance, scheduled a grievance meeting with ECC for May 16, which was five days later and potentially the last day of the 45 day period. Plaintiff refused to attend unless he could have his private attorney represent him at the hearing. Plaintiff's wife advised Lawson, "We will not go without representation. That's no. We, Eddie, would rather get somebody independent." However, Local 32BJ does not allow private attorneys to participate in the initial grievance meeting with the employer; it views itself as the employee's representative in

6

dealing with the employer. Lawson advised Spataro, the business agent supervisor, of plaintiff's position, and Spataro decided that Local 32BJ should not take any action to challenge plaintiff's termination.

Instead, Spataro referred the matter to the union's Grievance Appeal Board. This Board is made up of elected rank and file union members plus one union officer. Plaintiff knew the assigned officer to some extent, but none of the rank and file members. Plaintiff's attorney (not counsel of record in this action) submitted a written appeal on his behalf, asserting that plaintiff would show that his termination was in retaliation for "being a vocal member on behalf of the union and for his union activities." Plaintiff's attorney promised to produce "witnesses and documentary evidence" to support these claims. Local 32BJ advised plaintiff's attorney that it permitted only members, not their attorneys, to act before the Grievance Appeal Board, but that plaintiff's attorney could accompany him to the hearing and assist with the appeal.

Plaintiff appeared at the hearing and gave a 30 minute presentation on why his termination was improper. His argument was not at all based on "being a vocal member on behalf of the union." Instead, he argued that he was the victim of retaliation for having filed his first grievance back in 2001 (the one dealing with his transfer away from his preferred facility, in which he and Local 32BJ had prevailed). The retaliation, according to plaintiff, consisted of the assignment of excessive work, denial of the elevator operator position, and deprivation of supplies. Significantly, he did not mention that his request for a spray bottle had been misconstrued as a gun gesture (that explanation emerged for the first time in this litigation). He did not address this accusation about a gun gesture from the employer at all other than to condemn it as a lie

when the Board, having heard nothing from him about it, asked him directly. Instead of addressing the incident that led to his termination, he went through his prior grievances, both those successfully resolved, those not successfully resolved, and the incidents which he did not grieve at all. Nor did he deliver on his lawyer's promise in his submission that witnesses would be identified who could back up his claim that he was retaliated against for his union activities. The Board tried several times to induce plaintiff to address the specific events leading to his termination, but plaintiff barely mentioned them.

So this was the backdrop that the Grievance Appeal Board faced in determining whether prosecuting plaintiff's grievance was likely to succeed. It rejected his complaint, stating: "Member was discharged for threatening his supervisor. He was previously issued a final warning." Local 32BJ's Executive Board adopted the recommendation, and advised plaintiff that his appeal had been denied "based on the determination that the complaint lacks sufficient merit for the Union to be likely to prevail in arbitration."

This action followed.

## DISCUSSION

### I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). Once a moving party has met its initial burden to

demonstrate that no genuine issue as to any material fact exists, the nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in their favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." Zdziebloski v. Town of Greenbush, 336 F.Supp.2d 194, 201 (N.D.N.Y. 2004) (citing Carey v. Crecenzi, 923 F.2d 18, 21 (2d Cir. 1991)). Nonetheless, in determining whether genuine issues of fact exist, I am required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought...." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

## II. Duty of Fair Representation

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916 (1967). "A union's conduct can be classified as arbitrary only when it is irrational." Marquez v. Screen Actor's Guild, Inc., 525 U.S. 33, 46, 119 S.Ct. 292, 300 (1988); see also Caputo v. Nat'l Ass'n of Letter Carriers, 730 F.Supp. 1221, 1226 (E.D.N.Y. 1990). In other words, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 11 S.Ct. 1127, 1130 (1991) (citations and internal quotation marks omitted).

A union can also breach its duty where it acts in bad faith. "Bad faith," encompasses fraud, dishonesty and other intentionally misleading conduct. See White v. White Rose Food, a Div. of DiGiorgio Corp., 237 F.3d 174, 179 (2d Cir. 2001) (citing

9

Sim v. New York Mailers' Union No. 6, 166 F.3d 465, **472** (2d Cir. 1999) and Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. **1998**)). "[P]roof of mere negligence or errors of judgment on the part of the union is insufficient [to prove a breach of the duty of fair representation].... As long as the union acts in good faith, courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular advantage [sic]." Cook v. Pan Am. World Airways, Inc., 771 F.2d 635, 645 (2d Cir. 1985), cert. denied, 474 U.S. 1109, 106 S.Ct. 895 (1986), abrogated on other grounds by Lorance v. AT & T Tech., Inc., 490 U.S. 900, 109 S.Ct. 2261 (1989).

A union does not breach its duty of fair representation when it "fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." Cruz v. Local Union No. 3 of Int'l Broth. of Elec. Workers, 34 F.3d 1148, 1153-54 (2d Cir. 1994); see also Wozniak v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America-UAW, 842 F.2d 633, 636 (2d Cir. 1988) ("There is no arbitrariness in failing to process a bad case.") (citing Fristoe v. Reynolds Metals Co., 615 F.2d 1209, 1214-15 (9th Cir. 1980)).

Additionally, to succeed on a claim for breach of the duty of fair representation, a plaintiff must not only establish the arbitrariness or bad faith of the union's actions, but must also demonstrate a causal connection between the union's wrongful conduct and his injury. Spellacy, 156 F.3d at 126.

Against this analytical framework, the case becomes quite simple. Local 32BJ was faced with an unanswered accusation that plaintiff had been insubordinate and made

a threatening gesture, suggestive of firing a weapon at his employer, and had a final warning letter from a prior incident clearly advising that the consequences of such an action would be termination. There was nothing irrational about deciding that plaintiff's claim was not worth pursuing in light of those facts.

Plaintiff's argument before the Grievance Appeal Board did not assist his position because it was essentially a non-sequitur. That is, even if it was true that ECC had retaliated against plaintiff as a result of prior grievances, it did not explain his refusal to shovel snow or the unanswered charge that he had made a threatening gesture to his supervisor. Local 32BJ was within its discretion in concluding that those acts were not a meritorious response to plaintiff's claims of retaliation. Indeed, even if plaintiff had offered the spray bottle explanation to Local 32BJ, which he never did until this litigation, Local 32BJ would likely still have been within its discretion in concluding that the explanation was not sufficiently credible to warrant pursuing the grievance. But plaintiff never even gave Local 32BJ that chance.

Perhaps recognizing the difficulty of meeting the irrationality test, plaintiff primarily asserts here that Local 32BJ acted in bad faith, not at the Grievance Appeal Board level, but at the business agent level, seeking to pin blame on Lawson and to some extent Spataro for not investigating his claim. But the undisputed facts show that plaintiff tied their hands. Despite knowing the collective bargaining agreement well enough (as plaintiff contends he did) to demand appropriate clothing when asked to shovel snow, and his considerable prior exposure to the grievance process (plaintiff has portrayed himself as a resource to whom other workers came to find out their rights under the collective bargaining agreement), plaintiff waited until he was nearing the end

of the 45 day period to advise his union that he wished to challenge his termination. He did not leave Lawson any meaningful time to conduct an investigation or to do anything but set up the first meeting with the employer, which Lawson did and plaintiff refused to attend. Perhaps some sort of brief investigation could have been done, but when plaintiff refused to attend a meeting without legal representation, which Local 32BJ's practice does not allow, he effectively closed the door on the process.[2]

Although plaintiff conclusorily asserts that Lawson was "hostile" to him, there is no evidence to back up that allegation. The most that plaintiff can say is that Lawson was not as responsive to him as he would have liked, but that is not hostility. He can point to only one incident of disagreement, and that was when Lawson interrupted him at a meeting among workers to discuss vacation schedules, when plaintiff interjected that his (plaintiff's) failure to get the elevator position meant he had less time to spend with his wife. Lawson brought the discussion back to its topic by raising his hand and saying, "I don't want to hear more about your wife." This comment is hardly hostility in the workplace. I must conclude that the issue of fact that plaintiff is attempting to raise is feigned, not genuine.

More importantly, as previously noted, plaintiff never offered his spray bottle explanation to the union until after commencement of this litigation. He does not explain how the union can be faulted for not investigating his claim when he, the primary witness, was not cooperating in providing his side of the story. It would have been easy enough in the initial conversation with Lawson or in a written submission or a phone call

---

[2] Plaintiff points out that the Grievance Appeal Board hearing was more than 45 days after his termination so that it was an empty remedy. This is not at all clear, because Lawson had contacted ECC to set up the Step 1 grievance meeting, and thus the initial contact might well have satisfied the 45 day notice period.

to the union complaint office for plaintiff to have said, "**Look**, this is a misunderstanding. All I did was to ask for a coat and a spray cleaner bottle." Local 32BJ might well have picked up that grievance, but we will never know because plaintiff chose instead to have his wife tell Lawson that he would not attend the meeting that the union had set up with the employer unless his attorney could represent him there.[3] Even at the relatively late date of the hearing before the Grievance Appeal Board, neither plaintiff, nor his attorney in his written submission, ever offered the explanation of the incident that plaintiff has offered this Court.

Plaintiff's attempt to shift the focus away from the Grievance Appeal Board to Lawson and Spataro fails for another reason. As noted above, plaintiff has to raise an issue of fact that the union's alleged failure to properly investigate and pursue his claim was causally related to the injury, i.e., the loss of his job. Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998). On this record, I do not see how a reasonable jury could reach that conclusion. The Grievance Appeal Board allowed a thorough hearing on plaintiff's claim, for which plaintiff's lawyer had presumably prepared him but determined not to come despite the union's invitation. Plaintiff, however, had no answer to the gun allegation other than to call it a lie, which the Board did not find sufficient to warrant the fight. This decision was within the union's broad discretion. The Board was made up of strangers to plaintiff except for a casual acquaintance with the designated union officer (with no indication of any hostility

---

[3] There is nothing wrong with a union prohibiting an attorney from **advocating** on behalf of an employee at the grievance stage. It is a common practice for labor unions to have **union** officers rather than private attorneys represent union members even at the arbitration stage of **the grievance** process. See e.g. Steiny & Co., Inc. v. Local Union 6, Intern. Broth. of Elec. Workers, 5 F.3d 540 (9th Cir. 1993).

between him and plaintiff). Had Lawson or Spataro received the same explanation earlier, I do not see how their decision not to proceed further would have been more vulnerable.

Plaintiff responds that he might have been more forthcoming had Lawson asked him questions instead of the Grievance Appeals Board. Putting aside the inherent contradiction in saying he would have been more likely to tell his story to someone he distrusted (Lawson) than to a neutral board, the argument is too speculative to raise a factual issue. The bottom line is that plaintiff's refusal to cooperate, whether to Lawson or the Board, was akin to a robbery victim refusing to give the police a description of his assailant. An investigation is effectively stymied when the primary witness does not give his side of the story.

When an employee must prosecute a grievance against an employer through a union, as is the case in most collective bargaining agreements, he has to place himself in the union's hands, however reluctantly. Any mistrust in the union must be set aside, or at least suspended, because the union cannot effectively perform its duty of representation if the employee is fighting the union as well as the employer. If the employee's reservations about the union's good faith are well founded, and the union does not grieve on his behalf or does not represent him in good faith in the process, he may then pursue his judicial remedy. But he cannot do what plaintiff has attempted to do here, piggy-backing on the union's procedural role in commencing the grievance process with the intent of pushing it aside so that he can prosecute the claim independently with his lawyer. Cf. Republic Steel Corp. v. Maddox, 379 U.S. 650, 652-53, 85 S.Ct. 614, 616 (1965) ("the employee must afford the union the opportunity to act on his behalf").

14

This is why the employee must have fully cooperated in the grievance process to later assert a claim for breach of the duty of fair representation. In Pegump v. Rockwell International Corp., 109 F.3d 442 (8th Cir. 1997), for example, the plaintiff declined her employer's request to produce her mental health records to establish her mental competency (she had allegedly threatened to shoot plant managers, an allegation she denied), despite her union's urging her to do so, and the union therefore ceased processing her grievance. She claimed that the union had thereby taken the side of the employer in breach of its duty of fair representation, but the Eighth Circuit affirmed summary judgment against her. It held that given the broad discretion afforded unions, the union's position was not unreasonable. See also Bagsby v. Lewis Brothers, Inc., 820 F.2d 799, 805 (6th Cir. 1987) (Ryan, J., concurring) ("it was not the union's wrongful refusal to process the grievance, rather, it was Bagsby's wrongful refusal to do so and to cooperate with the union that prevented the alleged breach by the employer from being remedied through the grievance procedure"); Mack v. Otis Elevator Co., No. 00 Civ. 7778, 2001 WL 1636886 (S.D.N.Y. Dec. 18, 2001), aff'd in part and rev'd in part on other grounds, 326 F.3d 116 (2d Cir. 2003) (granting summary judgment on duty of fair representation claim where the plaintiff "failed to cooperate in Local 1's investigation of her claims").

Finally, I note that plaintiff faced a particularly difficult hurdle because his termination was not the result of an allegation of mere tardiness or insubordination, but an alleged threat of the use of violence. Local 32BJ had to be aware, and it would also expect that an arbitrator would be aware, of the special sensitivity raised by the issue of

violence in the workplace.[4] The employer's accusation, of course, had to be treated as only an accusation, but with plaintiff already under the burden of an ungrieved final warning letter that also accused plaintiff of aggressive misconduct, and with no response from plaintiff to the charge that he had made a gun gesture with his hand except to brand it a "lie," no reasonable jury could conclude that Local 32BJ acted outside of its broad discretion in determining not to pursue a grievance.

Because plaintiff's breach of fair representation claim fails, it is unnecessary to consider plaintiff's breach of contract claim against ECC. See Sanozky v. International Ass'n of Machinists and Aerospace Workers, 415 F.3d 279, 282 (2d Cir. 2005).

## CONCLUSION

Defendants' motions for summary judgment are granted and the complaint is dismissed.

**SO ORDERED.**

s/Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
October 30 , 2007

---

[4] According to OSHA, violence in the workplace is the fourth-leading cause of fatal occupational injury in the United States. See http://www.osha.gov/SLTC/workplaceviolence/index.html.